IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36359-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GORDON JAMES ENNIS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — K.S.,[1] a probationary officer with the Spokane Police

Department, attended a small party at the home of Douglas and Heather Strosahl in

October 2015 at which she claims she consumed too much alcohol and, while

incapacitated, was raped by a superior officer, Gordon Ennis. A trial that began in June

2017 was declared a mistrial when pretrial publicity about the charge and alleged

_____

[1] Initials are used to protect the victim's identity, consistent with a general order of this court. *See* General Order of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18, 2012) available at https//www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders&div=III.

evidence destruction prevented selection of a jury. The parties agreed to seek a change of venue but in February 2018 decided to try again to empanel a jury in Spokane.

A jury was selected and following a nine-day trial, it found Ennis guilty of second degree rape. He replaced his lawyer and moved for a new trial, alleging instructional error, prosecutorial misconduct, and ineffective assistance of counsel, including on the basis that his trial lawyer failed to develop evidence about Doug Strosahl that Ennis argued would have been helpful to his defense. The motion was denied.

Ennis appeals, renewing the arguments made in his new trial motion and making new allegations of ineffective assistance of counsel and prosecutorial misconduct. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

K.S. was working as a probationary police officer for the Spokane Police Department in October 2015 when she was invited to a party to be held on Saturday night, October 24, at the home of Doug and Heather Strosahl.[2] K.S. had graduated from Freeman High School in 2008 and obtained a criminal justice degree from Spokane Community College in 2012, with a view to becoming a police officer like her father.

---

[2] The Strosahls were engaged at the time of the party and had married by the time of trial. We refer to Heather Strosahl by her married name, and given the common last name, we frequently identify the Strosahls by their first names to avoid confusion. We intend no disrespect.

After working security jobs and volunteering as a reserve officer, she had been hired full-time by the police department in spring 2014.

Doug Strosahl had worked for 20 years in the Spokane Police Department and taught and mentored K.S. when she attended community college and participated in a reserve officer training program. Doug invited K.S. and Gordon Ennis to the party. Ennis was a Spokane police sergeant who had been a friend of both Strosahls for over 20 years. Ennis had served as a firearm instructor and taught K.S. while she was in training. Other guests at the Strosahls' party included Heather Strosahl's sister and several of her friends and coworkers. K.S. attended the party with her roommate, Callie Roseland.

Roseland did not consume alcohol at the party, but K.S. did, and like several others, became very intoxicated. She brought a six-pack of hard cider and estimated that she finished three of the hard ciders, each mixed with a shot of Fireball whiskey. She joined others in another shot of Fireball and vaguely recalls being offered a sip of Ennis's drink late in the evening, when guests had moved outside to the Strosahls' hot tub.

Ennis was one of the only people K.S. knew at the party. K.S. behaved warmly, and some guests would later say flirtatiously, toward him. Although K.S. has no recollection of it, at one point, she and Heather danced before Ennis, after which K.S. gave him a hug. Both she and Ennis would later testify that they had never had anything

3

but a professional relationship, however, and K.S. testified that she had "zero interest" in anything else. Report of Proceedings (RP)[3] at 835.

At around 11:00 p.m., most of the partiers moved out to the hot tub, where people continued to drink. By the time they came inside an hour or more later, alcohol consumption had taken its toll on several. Heather's coworker, Melissa Beaver, became ill and lay down on the floor of a bedroom in the basement. With the help of another of Heather's coworkers, Megan Weese, Heather got Beaver out of her swimsuit and into some dry clothes. Heather did not see Beaver again until the next morning. Beaver would later testify that her last recollection of the party was of being in the hot tub. When she awakened the next morning, she did not immediately know where she was. She was sick until around 7:00 on Sunday night.

Doug Strosahl had gone from the hot tub to his bedroom to change into dry clothes when he realized how intoxicated he was. He was lightheaded and nauseous, and when he lay down, the room was spinning. He fell asleep for a couple of hours and was hung over the next day.

K.S. does not recall leaving the hot tub but has a snapshot "vision" of throwing up into something. RP at 847. She had borrowed a swimsuit from Heather that she evidently removed, because she wandered naked into the living room, where Roseland,

---

[3] "RP" references are to the verbatim report of proceedings of the trial, unless otherwise indicated.

who was looking for her, saw her, stopped her, and led her to a bathroom. After K.S. lay naked on the bathroom floor, "completely incoherent" and "mumbling" according to Roseland, Roseland obtained help from Heather and Weese caring for K.S. as she vomited into the toilet. RP at 1063. Heather and Weese dressed K.S. in sweatpants and a T-shirt belonging to Heather and led her to a bedroom where Heather described the two women as "hoist[ing]" her into the bed. RP at 593. For clarity, we refer to this bedroom in which K.S. was intended to stay as "her" bedroom.

K.S. threw up again in her bedroom, using a bowl or bucket that Heather had left next to the bed. As Roseland sat with her, waiting for her to calm down and fall asleep, Ennis came in. Roseland describes K.S. as mostly incoherent and mumbling. The one thing she said to Roseland and Ennis that made sense was, "I don't want you guys to think I'm a bad cop." RP at 1068-69. Roseland and Ennis assured her they did not think she was a bad cop. The two of them conversed while they waited for K.S. to fall asleep. When she dozed off, they left her bedroom and joined Heather and Weese in the kitchen. Heather told Roseland that K.S. could spend the night, for which Roseland was grateful.

K.S. thereafter left her bedroom on two occasions that she does not recall. The first time she wandered into a nearby bedroom where Heather's sister, Gina Watkins, planned to spend the night. K.S. stumbled into the room holding the bowl she was supposed to use if she vomited again. Watkins called to her sister and Heather and Roseland responded to help. K.S. lay on the bed and vomited into the bowl. Heather and

5

Roseland walked K.S. back to her bedroom and put her back in bed. Ennis was aware that K.S. needed help being returned to her bedroom from Watkins's room.

Roseland left for home a little after 1:00 a.m. Weese called her husband at 1:08 a.m. to let him know she was taking care of a couple of "drunk girls" and would be home shortly. RP at 766.

Sometime around 2:30 a.m., K.S. left her bedroom again, wandering into the kitchen where Heather, Ennis, and Doug, who had awakened and come downstairs, were the last partiers standing. A few minutes earlier, Heather, Ennis, and Doug had looked in on K.S. and teased her about not being able to hold her liquor. Heather, Ennis, and Doug would later testify that when K.S. wandered into the kitchen, she walked up to Ennis, put her arms around his neck, and lay her head on his shoulder. The Strosahls left to go to bed and Heather told Ennis to help K.S. get back to bed. The Strosahls saw Ennis and K.S. walk back toward her bedroom. Heather recalls it being 2:38 a.m. when she got in bed.

According to K.S., she awakened to the feeling of fingers in her vagina, thrusting aggressively. She was not sure where she was. Ennis was on the bed next to her. When she realized what was happening, she started crying and tried to move away. Ennis pulled his hand away, said, "I got to go" and quickly got up and left. RP at 853. K.S. waited a few moments and then took her cell phone and locked herself in an adjacent bathroom.

6

She tried to call Spenser Rassier, a fellow police officer, friend, and occasional date. He was out of town for military training. Her phone records reveal that she tried to call him four times between 3:05 a.m. and 3:07 a.m., and he answered the fourth call. He would later describe her as "very upset" and crying during the call. RP at 962. She told him she was at a party at the Strosahls, that she had too much to drink, and that she woke up in a bedroom to someone fingering her, which Rassier understood to mean fingering her vagina. She would not tell Rassier who it was, but he was left with the impression that it was a police officer and someone he would know. K.S. and Rassier spoke for 54 minutes. After getting off the phone with him, she went back to her bedroom and went to sleep.

She awakened again shortly after 7:00 Sunday morning and called Roseland, asking her to pick her up. She told her what had happened. On Roseland's arrival, they spoke further and agreed they should tell Doug what had occurred. K.S. texted Doug at 8:22 a.m., asking him to come chat with her. He came to her bedroom, where K.S. told him, in Roseland's presence, what Ennis had done. K.S. was surprised at his reaction, which she characterized as "downplay[ing] it." RP at 876. He asked if she needed any water and left the room. When he did not return, K.S. found and changed into her own clothing, and she and Roseland left. Upon arriving home, she threw up again, showered, and, feeling ill, crawled into bed. She would later explain that she showered because she "felt . . . gross," and "wasn't thinking about evidence collecting." RP at 880, 894.

7

That morning, Heather Strosahl laundered the clothing that she and Weese had dressed K.S. in the night before. She later testified she was unaware of K.S.'s allegation of assault and was simply cleaning up bath towels, swimsuits, and other laundry from the party.

On Sunday afternoon, K.S. contacted her former field training officer, Kyle Heuett, for help, telling him what had happened. He informed her sergeant. At 8:44 p.m. that night, Detective Brandon Armstrong was called and assigned to investigate K.S.'s allegation. K.S. went to the hospital to have a sexual assault kit done that night after speaking with her sergeant. She then traveled to the public safety building and sometime around midnight provided a statement to Detective Armstrong and Sergeant Jack Rosenthal.

Arrangements were made to serve a search warrant for deoxyribonucleic acid (DNA) on Ennis at his lawyer's office on the afternoon of October 26. The intention had been to collect fingernail clippings from Ennis, but it was not possible because his nails had been trimmed so short that trying to cut any further could have injured him. Detective Armstrong directed close up pictures to be taken of Ennis's hands.

Armstrong obtained a warrant to search Ennis's car, and among the evidence that was collected were DNA swabs of the driver's seat belt. DNA obtained from the seat belt included Ennis's DNA, that of his wife, and that of a third person, which proved to be a match for K.S. The crime lab's forensic examiner concluded that the estimated

8

probability of selecting an unrelated individual at random from the United States population with a matching profile was 1 in 1.4 million. It was undisputed that K.S. had never been in Ennis's car.

In early December 2015, the State charged Ennis with second degree rape for "engag[ing] in sexual intercourse with [K.S.] when [she] was incapable of consent by reason of being physically helpless or mentally incapacitated." Clerk's Papers (CP) at 1. Ennis waived his speedy trial rights and a first trial was not undertaken until June 2017.

*Pretrial proceedings*

In pretrial proceedings in May 2017, both counsel raised questions about what testimony by or about Doug Strosahl might be offered in the upcoming trial. Doug had retained his own lawyer, Chris Bugbee. Ennis's lawyer, Robert Cossey, and the prosecutors each questioned what the other knew or had planned when it came to Doug, including whether the defense might offer him as an alternative suspect. Asked directly by the judge if there were potential suspect issues with Doug Strosahl, Cossey responded, "I gave my word to Mr. Bugbee I would not disclose that." RP (May 19, 2017) at 15. The trial court concluded, "I need to know what's going on with the Strosahl issue" and set a hearing for May 25, saying, "I want Bugbee here." RP (May 19, 2017) at 18-19.

Doug Strosahl appeared at the May 25 hearing not with Bugbee, but with a new lawyer, Joseph Sullivan. Cossey represented that after speaking with Sullivan, any issues raised by his conversation with Bugbee were moot because Doug would be testifying

9

consistent with the police report. Sullivan said the same thing, and that Doug would not be asserting a Fifth Amendment privilege, which was one of the court's concerns. Whatever Bugbee told Cossey remained, for the time being, a mystery. But the State's concerns were assuaged by Cossey's assurance on May 25, and even more adamantly on June 7, that information he received from Bugbee "is not going to be used by me in any shape or form in this trial." RP (June 7, 2017) at 80.

Also discussed on June 7 was a State in limine motion preventing Doug Strosahl from testifying that he did not report what K.S. told him the morning after the party because he did not think her story made sense, something he evidently said at one point. Cossey told the court he was not opposed to that being excluded.

*Mistrial*

A mistrial was declared during jury selection for the June 2017 trial. Not only did venire members report on a juror questionnaire that they had seen pretrial publicity, but a number read or watched news coverage during the voir dire process, contrary to admonitions from the judge. A defense motion for a mistrial was granted. In August 2017, the parties filed a joint recommendation for a change of venue.

The change of venue recommendation was never noted for hearing. The State was no longer advancing it when, in early February 2018, a new trial judge presided at a status conference for a trial set to begin a few weeks later in Spokane. Cossey told the court that Ennis was not withdrawing his venue change motion but wanted to see if it was

10

possible to seat a Spokane jury. He told the court, "I will tell you my client and I have discussed this; and we would prefer this case to stay in this county, in our courthouse, and with you." RP at 11-12. The court agreed to treat the motion as reserved until after voir dire.

Voir dire was completed and a jury was successfully empaneled without any renewal by the defense of a request for a venue change.

The State's evidence at trial was consistent with the facts recounted above. The State relied substantially on K.S.'s testimony and that of Roseland, as well as testimony from all of the testifying party guests that K.S. had been very intoxicated at points during the evening. It was undisputed that she had wandered through the house naked, was at one point passed out on the bathroom floor, vomited multiple times, and had to be dressed and delivered to bed by others. The State relied on her 3:07 a.m. call to Rassier and her conversations with Roseland and Doug Strosahl early Sunday morning. When Ennis testified on his own behalf in the defense case, the State took the opportunity in cross-examination to establish that he had violated written conditions of his pretrial release that he not have contact with Doug Strosahl and not discuss his case with any member of local law enforcement. He admitted that in violation of those conditions he had seen and spoken with Strosahl twice and had also used a Spokane police officer and a Spokane dispatcher in an attempt to get information to Doug.

11

In addition to Ennis, Heather Strosahl in particular, and some of the other partiers, testified that as the evening passed, K.S. sobered up and was not incapacitated by 2:30 a.m., when she was left to return to her bedroom with Ennis. The State sought to impeach some of their testimony with statements they had provided to detectives shortly after the party. Heather, for instance, had told detectives in 2015 that when she, Ennis, and Doug checked on K.S. at around 2:15 a.m., it was at her suggestion that they do a sweep and "make sure everybody's still alive." RP at 599. Heather also told detectives that when they looked in on her, K.S. "kind of moaned," and then, "reached out and was saying, 'Sarge, Sarge,'" to which "Gordon's like, 'Okay, you're all right. Go back to sleep.'" RP at 601.

Called as a defense witness, Beaver testified that she did not notice K.S. exhibiting intoxicated behavior, saying "[s]he seemed to be walking normal" and "talking just fine." RP at 1354. When cross-examined, however, Beaver acknowledged telling detectives that when first introduced to K.S., she thought K.S. was "a little wasted." RP at 1360.

The defense waived opening statement at the outset of trial and even at the beginning of the defense case, so Ennis's testimony, which came on the final day of trial testimony, was the first the jury heard about his defense. He admitted to engaging in sexual intercourse with K.S. at around 2:45 a.m. on October 25, but testified it was consensual.

Ennis testified that after K.S. came into the kitchen at around 2:30 a.m. and hugged him, she pulled on his waist toward her bedroom and they walked down the hall together. He testified she was not stumbling, swaying, or slurring her words. He testified that when he and she were about halfway down the hall, K.S. "leaned against the wall . . . [a]nd she grabbed me around the—the butt, and she pulled my hips in close to her and embraced me." RP at 1426. Once in her bedroom, he testified that K.S. put her legs around him, stroked his thigh and they engaged in mutual touching. When he began to rub her vagina through the outside of her sweatpants he testified that she pushed down her pants, grabbed his wrist and moved his hand between her legs. He inserted a finger in her vagina, which he said "continued for a little bit of time." RP at 1429.

Although testifying he was "lik[ing] it," he said he realized it was moving toward "full sex" and began thinking about the implications for his personal life (he was married) and his professional life. RP at 1429-30. He testified he told K.S. he needed to go home, but she wanted him to stay. When he insisted he could not stay, he testified K.S. pulled up her sweatpants and her demeanor changed. Ennis told her it was not her fault and if she wanted to talk about it they could at work, but he "need[ed] to go." RP at 1430.

Asked by Cossey if he cut his fingernails short in preparation for the evidence collection meeting, Ennis denied it, testifying he had cut them a few days earlier. Later, in redirect examination by Cossey, Ennis testified that he offered to clip his fingernails for law enforcement during the DNA collection meeting, but his offer was declined.

13

The State called Detective Armstrong in rebuttal, eliciting his testimony that he had no recollection of Ennis ever offering to cut his own fingernails. The prosecutor then asked, "Did you indicate in your report that he remained silent during the contact and conversations?" RP at 1472. The detective responded, "I indeed did." *Id.* The defense did not object.

In surrebuttal, the defense called Shirley Vanning, Cossey's investigator, who testified she was present for the DNA collection meeting and Ennis *had* offered to clip his fingernails. In cross-examination, she agreed that she had created no record of what took place at that meeting.

The jury began its deliberations at 11:10 a.m. It took slightly less than three hours to return its verdict finding Ennis guilty as charged.

*Postverdict events*

Following the verdict, Ennis changed counsel, hiring attorney Mark Vovos, who filed a motion for a new trial on several grounds. One was ineffective assistance of counsel by Cossey, who Ennis now claimed had a conflict of interest that adversely affected his defense. In support of his new trial motion, Ennis submitted declarations of himself and his wife, both of whom claimed that in a meeting at Cossey's office on November 2, 2015, Cossey told them that Doug Strosahl's lawyer, Bugbee, had informed him that Doug had consensual sexual contact with K.S. at the Strosahls' party, prior to the contact that took place between K.S. and Ennis. They claim they were told that the

14

contact Doug had was manual stimulation and insertion of fingers, and that K.S. had believed Doug to be Ennis. They claim they were told by Cossey not to tell anyone. They nonetheless believed the information would be used in Ennis's defense.

Bugbee retained a lawyer who promptly obtained orders that temporarily prevented the clerk's office from making public the new trial motion and its supporting declarations, pending hearing of a motion by Bugbee to seal the records. While the trial court temporarily protected the materials from public disclosure, it ultimately denied the motion to seal, noting that the media had objected and finding that the *Ishikawa*[4] factors were not met.

The State filed a motion for leave to depose Cossey, arguing that by filing the declarations, the Ennises had waived attorney-client privilege. The trial court agreed with the State in part, and, in a letter ruling, authorized the State to interview Cossey, identified the scope of the privilege waiver, and granted Ennis's request for a protective order preventing disclosure of the information obtained. Cossey was interviewed about information he received from Bugbee, his decision not to use the information, and his conversations with the Ennises. Cossey disputed important aspects of the Ennises' declarations. The State's opposition to Ennis's new trial motion, which attached a

---

[4] *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 640 P.2d 716 (1982).

15

transcript of Cossey's interview, was sealed pending completion of Ennis's criminal case, including appeal and any retrial.

The court denied the motion for a new trial. Ennis appeals. Further details about the trial evidence and procedure are provided in addressing Ennis's assignments of error.

## ANALYSIS

Ennis identifies four categorical issues on appeal and identifies over a dozen sub issues. We address them in the order presented.

I.     CORROBORATION INSTRUCTION

The Washington criminal code provides, with respect to the sex offenses proscribed by chapter 9A.44 RCW, that "[i]n order to convict a person of any crime defined in this chapter it shall not be necessary that the testimony of the alleged victim be corroborated." RCW 9A.44.020(1). In June 2017, before Ennis's first aborted trial and nine months before his second trial, the State proposed the following jury instruction:

> In order to convict a person of Second Degree Rape, it is not necessary that the testimony of the alleged victim be corroborated.

Clerk's Papers (CP) at 89. Ennis did not object to the instruction, which was given.

Ennis now argues that the instruction was a judicial comment on the evidence and interfered with his constitutional right to present a defense. RAP 2.5 generally precludes an appellant from complaining of error for the first time on appeal, but Ennis argues that

the giving of the instruction qualifies as "manifest constitutional error" reviewable under

RAP 2.5(a)(3).

Before 1913, corroboration of the complaining witness in a rape case was required

by statute. *See State v. Morden*, 87 Wash. 465, 467, 151 P. 832 (1915). That changed

with repeal of the statute in 1913, and the challenged corroboration instruction accurately

states Washington law as it has existed since the 1913 repeal. *See id.* For a time, it might

have been important to communicate to a jury that there was no longer a requirement for

corroboration. Today, a corroboration instruction is at best anachronistic; depending on

the case, it can be problematic.[5] It is not problematic in this case.

*Comment on the evidence*

In *State v. Clayton*, 32 Wn.2d 571, 573, 202 P.2d 922 (1949), the defendant

challenged the giving of a corroboration instruction not unlike the one given here

---

[5] Ennis cites as persuasive *State v. Steenhard*, an unpublished decision from this court in which the giving of a corroboration instruction (timely objected to) was a factor in the majority's decision to reverse and remand child molestation charges for a new trial. No. 35578-1, slip op. at 16 (Wash. Ct. App. Jul. 23, 2019) (unpublished), https://www .courts.wa.gov/opinions/pdf/355781_unp.pdf.

In *Steenhard*, sexual misconduct allegations that were fantastical in some respects were made by two young girls. Given defense evidence of the number of people at the times and places where the misconduct allegedly occurred, the absence of corroboration was an issue. The State elicited testimony vouching for the girls' truthfulness from two witnesses.

No error was found in the giving of the corroboration instruction; rather, viewed in light of improper vouching, the instruction contributed to prejudicial error. *Id*. It was a confluence of factors that created a risk that the jury would not subject the victims' testimony to the even-handed examination it deserved.

upon the ground that it constitutes a comment on the evidence, violative of Article IV, § 16, of the state constitution, in that the instruction singles out the prosecutrix from all the other witnesses and tells the jury that the weight of her testimony is such that a conviction can be based upon it alone.

Judicial comments on the evidence are explicitly prohibited by the constitution and a challenge to a comment on the evidence can be raised for the first time on appeal. *State v. Levy*, 156 Wn.2d 709, 719-20, 132 P.3d 1076 (2006).

In *Clayton*, the Supreme Court observed that article IV, section 16's language that "[j]udge[s] shall not charge [juries] with respect to matters of fact, nor comment thereon," "means no more than that the judge is forbidden to convey or indicate to the jury, by word or act, his personal opinion as to the truth or falsity of any evidence introduced upon the trial." 32 Wn.2d at 573. The Court acknowledged that with the corroboration instruction it had given in Clayton's trial

the trial court in a sense singled out the testimony of the prosecutrix. However, what the court thereby told the jury was not that the uncorroborated testimony of the prosecutrix in the instant case *was sufficient* to convict the appellant of the crime with which he was charged, but, rather, that in cases of this particular character, a defendant *may* be convicted upon such testimony alone.

*Id.* at 574 (some emphasis added). It observed that "the trial court expressed no opinion as to the truth or falsity of the testimony of the prosecutrix, or as to the weight which the court attached to her testimony, but submitted all questions involving the credibility and weight of the evidence to the jury for its decision thereon." *Id.* at 573-74.

18

The same is true of the instruction given in Ennis's trial.  The instruction accurately stated the law as provided by RCW 9A.44.020(1).  It expressed no view as to the truth or falsity of K.S.'s testimony or the weight to be given it.  The instructions submitted those matters to the jury.

Ennis points out that a member of our court expressed sympathy with the view that a corroboration instruction is a comment on the evidence in *State v. Chenoweth*, 188 Wn. App. 521, 538, 354 P.3d 13 (2015) (Becker, J., concurring).  As Judge Becker conceded, however, we do not write on a clean slate.  *See id.*  On the issue of whether a corroboration instruction is an unconstitutional comment on the evidence, *Clayton* is binding on us.  *See State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984) (once the Washington State Supreme Court has decided an issue of state law, its conclusion is binding on lower courts).

Ennis also points out that in *State v. Johnson*, 152 Wn. App. 924, 936, 219 P.3d 958 (2009), it was suggested that perhaps a corroboration instruction should always incorporate in the court's instruction elsewhere that the jury is to resolve all issues of credibility and weight.  If instructions on the jurors' role in assessing credibility and weighing evidence were often overlooked in closing arguments, we might agree.  But in criminal cases, instructions about the jurors' responsibility to assess credibility and weight are among a few that the State or the defense, and ordinarily both, consistently

19

address during closing argument. That happened in the closing arguments in Ennis's trial. The State never mentioned the corroboration instruction.

In his briefing on appeal, Ennis argues that he should have been as free as K.S. to argue that his testimony did not need to be corroborated. We agree. It might have been a strange argument to make in his case because, as the trial court pointed out in denying Ennis's new trial motion, this was a case in which both sides presented quite a bit of corroborative-type evidence on the issue in dispute: K.S.'s capacity. Nonetheless, Ennis could easily have made the argument that his testimony did not have to be corroborated by pointing to the trial court's instructions. It is unimaginable, if defense counsel had argued that Ennis's testimony did not have to be corroborated, that the State would have objected. If the State did the unimaginable and objected, it is inconceivable that the trial court would not have overruled the State's objection. And if both the unimaginable and inconceivable happened, with the jury led to believe that the defense, but not the State, must present corroborating evidence, we would reverse any conviction and order a new trial.

There is no need for a corroboration instruction, and it would be better not to give one.[6] If the instruction is given, however, standard instructions will generally enable the

---

[6] Ennis points out that the Washington Supreme Court Committee on Jury Instructions recommends against giving such an instruction, and this court has shared the committee's misgivings in published and unpublished decisions. As the committee points out, "[t]he matter of corroboration is really a matter of sufficiency of the evidence"

defense to put the instruction in a proper perspective. This is probably what the Supreme Court had in mind in *Clayton*, when, having rejected the argument that a corroboration instruction is a judicial comment on the evidence, it made the further observation that judgments will not be reversed for an error that could not reasonably be presumed to have prejudiced the appellant. 32 Wn.2d at 574, 577. Given the jury instructions available to a criminal defendant, it will be the rare case where the giving of a corroboration instruction is reversible error.

*Deprivation of the constitutional right to present a defense*

Citing *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), and *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010), Ennis also characterizes the giving of the corroboration instruction as violating his due process right to a meaningful opportunity for his defense to be heard. Despite the breadth of *Chambers*'s reference to a "right to a fair opportunity to defend against the State's accusations," 410 U.S. at 294, the right to present a defense is not implicated by anything happening at trial that a defendant later contends was unfair. In *Chambers* and *Jones*, the rights at issue were the right to confront and cross-examine witnesses and call witnesses

---

and "[w]hether a jury can or should accept the uncorroborated testimony of the prosecuting witness or the uncorroborated testimony of the defendant is best left to argument of counsel." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL § 45.02, cmt. at 917 (4th ed. 2016). As Judge Becker observed in her concurrence in *Chenoweth*, "Many correct statements of the law are not appropriate to give as instructions." 188 Wn. App. at 537.

on one's own behalf.  *Id.*; *Jones*, 168 Wn.2d at 720.  Ennis does not identify any evidence he was prevented from presenting as a result of the unobjected-to corroboration instruction.

He instead makes a conclusory argument that the corroboration instruction, in conjunction with instruction on the defense of reasonable belief that he requested, "misled" and "confus[ed]" the jury.  Appellant's Opening Br. at 52-53.  Even if that were so, he cites no authority that clear and consistent jury instructions are one of the minimum guarantees of due process.  And he fails to provide an example of any argument he was entitled to make, but was prevented from making, by virtue of the two instructions.  No violation of his right to present a defense is shown.

II.    PROSECUTORIAL MISCONDUCT AND RELATED INEFFECTIVE ASSISTANCE OF COUNSEL

Ennis alleges seven instances of prosecutorial misconduct on appeal.  One of the instances of alleged misconduct was argued as a basis for a new trial, so we have the benefit of the trial court's view.  After an overview of the applicable law, we first address the misconduct alleged in the new trial motion and then turn to the misconduct alleged only on appeal.

A.    OVERVIEW

Prosecutorial misconduct is not attorney misconduct in the sense of violating rules of professional conduct.  *State v. Fisher*, 165 Wn.2d 727, 740 n.1, 202 P.3d 937 (2009).

It is, instead, a term of art that refers to "prosecutorial mistakes or actions [that] are not harmless and deny a defendant [a] fair trial." *Id*. To succeed on a prosecutorial misconduct claim, an appellant has the burden of establishing that the prosecutor's conduct was improper (as being at least mistaken) and was prejudicial. *State v. Stenson*, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997).

When a defendant fails to object in the trial court to a prosecutor's statements, he waives his right to raise a challenge on appeal unless the remark was so flagrant and ill intentioned that it evinced an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury. *Id*. at 719. "Defense counsel's decision not to object or request a curative instruction 'strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial.'" *State v. Gauthier*, 189 Wn. App. 30, 38-39, 354 P.3d 900 (2015) (quoting *State v. Swan*, 114 Wn.2d 613, 661, 790 P.2d 610 (1990)).

The hurdles to obtaining relief based on prosecutorial misconduct are purposefully high. *In re Pers. Restraint of Richmond*, No. 37057-7-III, slip op. at 3-4 (Wash. Ct. App. Mar. 18, 2021), https://www.courts.wa.gov/opinions/pdf/370577_pub.pdf. Inconsequential prosecutorial missteps do not merit remand. *See id.* Deference is owed to the trial court's ability to oversee the administration of justice, defense counsel's judgment about whether an objection was worth raising, and a jury's ability to independently assess the merits of the case. *Id*.

When a defendant has alleged prosecutorial misconduct in the trial court, we will

give deference to the trial court's ruling on the matter. *Stenson*, 132 Wn.2d at 719. The

trial court is in the best position to most effectively determine if prosecutorial misconduct

prejudiced a defendant's right to a fair trial. *Id.*

B.    MISCONDUCT ALLEGED IN SUPPORT OF NEW TRIAL MOTION: COMMENT ON
      THE RIGHT TO SILENCE

Ennis relied in moving for a new trial on one allegation of prosecutorial

misconduct: the following statements made by the prosecutor in closing argument (the

emphasis is Ennis's):

> Part of what you will do in this case is to look at the testimony and examine
> it. We heard the defendant's statement for the first time yesterday when he
> took the stand. The defendant is presumed innocent . . . . He is not
> presumed credible.

CP at 412 (*see* RP at 1496).

> And again, this applies equally to the defendant's statement. You can look
> at the timing and accuracy of a statement, and you can also consider how
> someone testifies and what motive or bias they may have.

*Id.* (*see* RP at 1497).

> You can look at the timing of statements in this case and the testimony that
> contradicts not only the claim by the defendant that [K.S.] was flirting, but
> also that by the time this occurred she had suddenly been ridden all of the
> effects of being intoxicated.

*Id.* at 413 (*see* RP at 1499).

> The defendant spoke to you the other day after having two years and four
> months and access to reports and being seated in the courtroom throughout

24

> this, and he gave you a version of events that you must analyze. And it's a version of events, ladies and gentlemen, that was driven by the fact that despite the defendant's efforts, DNA was discovered in this case. The defendant had hoped first that he would go undetected because [K.S.] was not in any condition he thought to remember the report.

*Id.* (*see* RP at 1500).

> That took away some options from the defendant as to what he would testify to. His testimony was full of justifications, not taking responsibility. Ladies and gentlemen, actions can speak louder than words.

*Id.* (*see* RP at 1510). Ennis contends that this argument improperly commented on his exercise of his right to silence.

The Washington and United States Constitutions protect a defendant's right against self-incrimination, which includes the right to silence. U.S. CONST. amend. V; WASH. CONST. art. I, § 9. When silence is protected, we distinguish between comments on silence and mere references to silence. *State v. Burke*, 163 Wn.2d 204, 221-22, 181 P.3d 1 (2008). "A comment on an accused's silence occurs when used to the State's advantage either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt." *State v. Lewis*, 130 Wn.2d 700, 707, 927 P.2d 235 (1996). Analyzing how the reference is used—its "imputation"—"examines the prosecutor's intent and whether the jury would naturally and necessarily take the comments as referring to the defendant's silence." *Burke*, 163 Wn.2d at 222 (citation and internal quotation marks omitted).

25

In responding to Ennis's motion for a new trial, the prosecutor argued that her statements challenged by Ennis did not comment on silence; they concerned the credibility of Ennis's testimony and included a permitted "tailoring" argument. Sealed CP at 1349-54. A tailoring argument calls the jury's attention to the fact that a criminal defendant who chooses to testify has had the opportunity to hear all other witnesses and can tailor his testimony accordingly. *Portuondo v. Agard*, 529 U.S. 61, 63, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000). In *Portuondo*, the United States Supreme Court rejected an argument that its decision in *Griffin v. California*, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965), should be extended to foreclose tailoring arguments under the Fifth Amendment to the United States Constitution. In *Griffin*, the Supreme Court had held that the Fifth Amendment forbad comment by the prosecution or instruction by the court that an accused's silence is evidence of guilt. *Id.* at 615.

In *Portuondo*, the Supreme Court held that the principles and reasoning that prohibit comments suggesting that silence is evidence of guilt do not apply to a prosecutor's comments that a defendant who testifies has tailored his testimony. Comments about tailoring, the Court reasoned,

> concern[ the defendant's] *credibility as a witness*, and [are] therefore in accord with our longstanding rule that when a defendant takes the stand, "his credibility may be impeached and his testimony assailed like that of any other witness." *Brown v. United States*, 356 U.S. 148, 154, 78 S. Ct. 622, 2 L. Ed. 2d 589 (1958). "[W]hen [a defendant] assumes the role of a witness, the rules that generally apply to other witnesses—rules that serve the truth-seeking function of the trial—are generally applicable to him as

26

> well." *Perry v. Leeke*, 488 U.S. 272, 282, 109 S. Ct. 594, 102 L. Ed. 2d 624 (1989).

529 U.S. at 69 (third and fourth alterations in original).

Washington courts have construed the Washington Constitution as placing limits on tailoring arguments. Tailoring arguments are permitted under article I, section 22 of the Washington Constitution, but only when the argument of tailoring can be inferred from a defendant's testimony: either direct, or in cross-examination.

State constitutional protections against tailoring arguments were first addressed in *State v. Martin*, 171 Wn.2d 521, 252 P.3d 872 (2011), in which our high court undertook a *Gunwall*[7] analysis and concluded that article I, section 22 of the Washington Constitution is more protective than the Sixth Amendment to the United States Constitution, which was also at issue in *Portuondo*. *Martin* adopted the position of Justice Ginsburg's dissent in *Portoundo*. Justice Ginsburg agreed that a criminal defendant's opportunity to tailor could be relevant credibility evidence, but in her view, allowing tailoring arguments to be made in every case, absent any evidence developed on the issue, went too far. It "transforms a defendant's presence at trial from a Sixth Amendment right into an automatic burden on his credibility." *Portuondo*, 529 U.S. at 76 (Ginsburg, J., dissenting).

---

[7] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

*Martin* quoted the following language from Justice Ginsburg's dissent as

"compatible with the protections provided by article I, section 22":

> "The truth-seeking function of trials may be served by permitting
> prosecutors to make accusations of tailoring—even wholly generic
> accusations of tailoring—as part of cross-examination.  Some defendants
> no doubt do give false testimony calculated to fit with the testimony they
> hear from other witnesses.  If accused on cross-examination of having
> tailored their testimony, those defendants might display signals of
> untrustworthiness that it is the province of the jury to detect and interpret.
> But when a generic argument is offered on summation, it cannot in the
> slightest degree distinguish the guilty from the innocent.  It undermines all
> defendants equally and therefore does not help answer the question that is
> the essence of a trial's search for truth: Is this particular defendant lying to
> cover his guilt or truthfully narrating his innocence?"

171 Wn.2d at 535-36 (quoting *Portuondo*, 529 U.S. at 79 (Ginsburg, J., dissenting)).

*Martin* continued, "In other words, Justice Ginsburg distinguished a comment in closing

argument that is 'tied only to the defendant's presence in the courtroom and not to his

actual testimony' from accusations made during cross-examination of the defendant . . . .

The latter, she concluded, do not violate the Sixth Amendment." *Id.*

In *State v. Berube*, 171 Wn. App. 103, 117, 286 P.3d 402 (2012), this court held

that the State can argue tailoring in closing without having explored it in cross-

examination if the defendant's testimony in direct examination provides a basis for the

argument.  It was argued in closing in *Berube* that the defendant tailored his direct

testimony to conform to his mother's testimony, which conflicted with his own earlier

statement to police.  This court rejected Berube's argument that the closing argument was

28

improper because he was not cross-examined about tailoring, holding that the State's argument was nonetheless "a logical attack on the defendant's credibility and does not burden the right to attend or testify. And it makes no sense to require the State to raise the issue again on cross-examination in order to make its credibility argument in closing." *Id.*

In defending against Ennis's new trial motion, the State contended it made a tailoring argument that had a basis in Ennis's trial testimony. *See* Sealed RP at 1711. In direct examination, Ennis's trial lawyer repeatedly asked, and Ennis repeatedly agreed, that his recollection of events was consistent with a time line compiled and testified to by Detective Armstrong. *See, e.g.*, RP at 1390-91, 1396, 1406, 1423, 1427.

After this direct testimony tying Ennis's recollection of events to Detective Armstrong's testimony, the prosecutor led her cross-examination of Ennis with the following questions, receiving the following answers:

> Q. Mr. Ennis, you've had an opportunity to review Detective Armstrong's timeline and the reports in this matter prior to testifying, correct?
>
> A. Some of the reports and the timeline, yes, ma'am.
>
> Q. And you've had access to those things for over two years before today, correct?
>
> A. Off and on, yes.

RP at 1435. Later, she questioned him about his ability to provide almost two hours' worth of trial testimony to "a variety of details down to the minutiae." RP at 1437. Ennis responded:

> A.   Well, it's something that I've thought about, all the details of that party as soon as the allegation was made.
>
> Q.   So—
>
> A.   I started thinking back to everything that I had seen, everything that I had heard at that party. For two years and four months it's all I've thought about every single day. So yeah, I have some pretty good recall of what happened that night.
>
> Q.   And you thought about how to explain your actions to your wife?
>
> A.   Yes, ma'am.

RP at 1437-38.

One issue, then, is whether the prosecutor's challenged statements were a comment on Ennis's exercise of his right to remain silent or, instead, a permitted argument that his opportunity to tailor was a reason to doubt his credibility.

In refusing to grant a new trial on account of the prosecutor's statements in closing, the trial court explained in her oral ruling that she had broken the challenged statements into three comments. The first, that "[w]e heard the defendant's statement for the first time yesterday when he took the stand," she found to be brief and "somewhat ambiguous." RP at 1779. She observed that "it was in the midst of a discussion with regard to credibility." *Id*. at 1780. As the trial court pointed out, the prosecutor made no specific reference to silence or to any exercise of Ennis's Fifth Amendment rights.

30

Recognizing that no objection was made, she said, "[t]he comment would have to have been a comment on silence; and it would have to have been flagrant, ill-intentioned, or unable to be cured by instruction. And it was none of those things." *Id*.

Second, as analyzed by the trial court, were the prosecutor's challenged statements suggesting that jurors consider the timing of statements. These challenged statements appear at pages 1497 and 1499 of the report of proceedings. At this point in the prosecutor's argument, she directed the jurors' attention to their instruction on assessing witness testimony (apparently displaying it on a screen), specifically pointing out that "[p]art of what you consider is the reasonableness of the testimony in the context of the entirety of the case and other witnesses. You can look at the timing and accuracy of a statement, and you can also consider how someone testifies and what motive or bias they may have." RP at 1497.[8] These challenged comments occurred in the course of the

---

[8] The verbatim report of proceedings reports the prosecutor as referring to instruction 12, but it is apparent that the instruction being displayed, which the prosecutor described as a "multiple-page instruction," with the language she was discussing "at the top of page 2," must have been instruction 1. RP at 1496. Language at the top of page 2 of instruction 1 states, in part:

> In considering a witness's testimony, you may consider these things: the opportunity of the witness to observe or know the things he or she testifies about; the ability of the witness to observe accurately; the quality of a witness's memory while testifying; the manner of the witness while testifying; any personal interest that the witness might have in the outcome or the issues; any bias or prejudice that the witness may have shown; the reasonableness of the witness's statements in the context of all of the other

31

prosecutor's attack on the plausibility of Ennis's version of events. *See* RP at 1497-99.

The trial court construed references to "timing" in this context to be references to

statements made at the party at around the time of commission of the crime, adding "and

again, there was no objection. So I don't believe that that was even a subtle comment on

silence." RP at 1781.

The last category was the prosecutor's reference to Ennis's testimony about the

two years he had to think about events on the night and morning of the party. The trial

court said these statements "come[ ] the closest to tailoring that you get." RP at 1781.

She did not view them as tailoring, however, because Ennis had not made prior

statements that he was now correcting with the benefit of having heard the testimony of

others. She did not view them as a comment on silence, however, and observed that, here

again, there was no objection.

With respect to the last category of statements, we view tailoring differently and

are satisfied that the prosecutor had a basis in Ennis's testimony for making a tailoring

argument.

Beyond that, the trial court, having been present for the closing arguments,

assessed this claim of prosecutorial misconduct from a superior vantage point. Her

---

evidence; and any other factors that affect your evaluation or belief of a
witness or your evaluation of his or her testimony.

CP at 314.

conclusions that the prosecutor's statements were not comments on silence and were not

so flagrant and ill intentioned that any resulting prejudice could not have been cured by

instruction are reasonable.  We defer to them.

C.      OTHER ALLEGED PROSECUTORIAL MISCONDUCT

Ennis alleges six other instances of prosecutorial misconduct for the first time in

his opening brief.

*Eliciting improper testimony on Ennis's exercise of his right to silence*

Recall that Ennis testified that during the evidence collection meeting he offered to

cut his own fingernails, and that the prosecutor questioned Detective Armstrong about

that in its rebuttal case.  Ennis does not challenge the prosecutor's question to the

detective about whether he remembered Ennis making such a statement, or the

detective's answer that he did not.  He does challenge the prosecutor's follow-up

question, which he characterizes as whether Ennis "'remained silent during the [DNA

collection] contact and conversations?'" and the detective's response that Ennis did, in

fact, remain silent.  Appellant's Opening Br. at 73-74 (alteration in original) (quoting RP

at 1472).  Ennis argues that the question concerned silence after Ennis had received

*Miranda*[9] warnings and was "completely unnecessary," since the detective had already

testified to not recalling such an offer.  *Id.* at 74.

---

[9] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Ennis's brief does not fully reproduce the prosecutor's follow-up question. The prosecutor asked, "Did you *indicate in your report* that [Ennis] remained silent during the contact and conversations?" thereby drawing the detective's attention to his contemporaneous report. RP at 1472 (emphasis added). Evidence of a contemporaneous record that Ennis did not say anything carries weight that goes beyond the detective's testimony that, two years later, he did not recall such a statement.

"If an accused elicits evidence pertaining to post-arrest silence, then the State can introduce rebuttal evidence on the same subject under the open door rationale." *State v. Rushworth*, 12 Wn. App. 2d 466, 475, 458 P.3d 1192 (2020); *State v. Holmes*, 122 Wn. App. 438, 443, 93 P.3d 212 (2004) ("[W]here a defendant claims to have provided information to the officers at the time of arrest" the State may introduce "evidence that actually the defendant remained silent.").

Ennis argues that the State went too far when it couched the question "us[ing] *Miranda* language." Appellant's Reply Br. at 11. But inquiring about the report was legitimate rebuttal and the prosecutor might have wanted to remain true to the report language she was asking about. In context, reasonable jurors would have understood the question and answer as rebutting Ennis's testimony that he made the offer, not as a comment on his exercise of a Fifth Amendment right.

*Vouching*

It is improper for a prosecutor to personally vouch for or against a witness's credibility. *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995). "Improper vouching generally occurs (1) if the prosecutor expresses his or her personal belief as to the veracity of the witness or (2) if the prosecutor indicates that evidence not presented at trial supports the witness's testimony." *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). "Prosecutors may, however, argue an inference from the evidence, and prejudicial error will not be found unless it is 'clear and unmistakable' that counsel is expressing a personal opinion." *Brett*, 126 Wn.2d at 175 (quoting *State v. Sargent*, 40 Wn. App. 340, 344, 698 P.2d 598 (1985)).

Mr. Ennis contends the following comments in the prosecutor's closing argument were improper vouching (the emphasis is Ennis's):

> [K.S.] never stopped Officer Heuett from making that report, *because she knew the truth.* And [K.S.] *has abided by that truth* for two years and four months.

Appellant's Opening Br. at 82 (alterations in original) (quoting RP at 1513).

> [K.S.] refused to give up on a job she loves, and *she has abided by the truth in this courtroom under oath in front of each of you and everyone else here.*

*Id*. at 83 (alteration in original) (quoting RP at 1514).

> And ladies and gentlemen, *when you find* [K.S.]'s *credibility to be such that her statement to you is nothing more and everything that includes the truth*, you will realize under the law that the state has met its burden.

*Id.* (alteration in original) (quoting RP at 1543).

> [T]he defendant in his—in his statement suggested to you that this was a woman that had an agenda; that she was so jilted by this experience and her sexual aggressiveness being stopped by a defendant that she began a vendetta; *that she stayed with that for two years and four months; that she, committed to a profession that supposed to be about the truth, stayed with that truth.*

*Id.* (alteration in original) (quoting RP at 1543).

> [W]hen you look at the facts in this case . . . *the truth and the reality of what occurred will be clear.* Not based on emotion, not based on games by the state, *not based on anything else than the truthful word of* [*K.S*].

*Id.* (alterations in original) (quoting RP at 1543-44). No objection was made to this

argument.

The complained-of statements are not vouching because they do not indicate the

prosecutor's personal opinion as to K.S.'s veracity. They are inferences tied to the

evidence. During K.S.'s testimony, she was asked about some of the things she had to

deal with as a result of reporting being raped by Ennis:

> I've had friends not talk to me ever again; you have—yeah, I've had a lot of that; a lot of I walk in the room and people glare at me; people see me in public and immediately duck to avoid me; a lot of hearing rumors; just everything in the media.

RP at 935. Although K.S. testified that she was still working as a police officer

"[b]ecause I love the job," she said her work life was "pretty shit—it's pretty bad." *Id.* at

935-36. Asked about what had changed, she answered:

36

[J]ust not being able to trust anybody there has been the biggest thing. Um, I had—I had my job like up on this pedestal, that it was the greatest thing ever and I'm so thankful to be a police officer and work for the city, and then just like that I—I never wanted to go to work again, because very quickly it was evident that people I thought had my best interests didn't and people that I thought I could trust my life with I can't even trust my emotions with.

*Id.*

It was fair argument to ask jurors which made more sense: That K.S. put herself through all of this out of anger that Ennis cut off a one-time consensual sexual encounter? Or because she had been raped?

There was no clear and unmistakable statement of personal opinion. The argument was proper.

*Commenting on a witness's credibility and impugning defense counsel*

In addition to it being improper for a prosecutor to personally vouch for or against a witness's credibility, it is improper for a prosecutor to disparagingly comment on defense counsel's role or impugn defense counsel's integrity. *State v. Thorgerson*, 172 Wn.2d 438, 451, 258 P.3d 43 (2011). A prosecutor improperly impugns defense counsel's integrity when she states that defense counsel is using deception or dishonesty. *E.g.*, *State v. Lindsay*, 180 Wn.2d 423, 433, 326 P.3d 125 (2014) (stating that defense counsel's argument was a "crock" implied the use of deception and dishonesty); *Thorgerson*, 172 Wn.2d at 452 (referring to the defense case as "sleight of hand" was

improper because the phrase implied the use of "wrongful deception or even

dishonesty").

During Beaver's testimony in the defense case, she testified that she did not

observe any intoxicated behavior by K.S. The State's cross-examination included the

following exchange:

> Q. Do you recall being interviewed by detectives Jeffery Mitchell and Rob Satake?
>
> A. Yes.
>
> . . . .
>
> Q. Okay. And do you recall them talking about, or asking you about being introduced to [K.S.] and Callie in the kitchen?
>
> A. Yes.
>
> Q. Do you recall telling them, "I don't know if they were trying to be funny. I think they were just a little wasted at that point in time"?
>
> A. Um, I do recall that. However—
>
> Q. Okay. I know you told Mr. Cossey just now that they weren't, but—
>
> A. Right.
>
> Q. —you did tell detectives back then that?
>
> A. Correct.
>
> Q. Okay.
>
> A. But wasted—
>
> Q. *No, that's fine. Mr. Cossey can clean that up, and you can explain why you're changing it now.*
>
> MR. COSSEY: Objection, your Honor.
>
> THE COURT: Okay, sustained.

38

RP at 1360-61 (emphasis added).  Because an objection was timely made, Ennis must demonstrate only that the prosecutor's statement was improper and prejudicial.

The State properly concedes that the prosecutor's objected-to statement improperly, argumentatively, impugned Beaver's credibility.  But it argues the error was harmless.  We agree.  The court sustained the defense objection, signaling that the statement was improper.  Whether Beaver was changing her report of events was something that was legitimately explored and that the jury could assess for itself.  And Beaver was not a key witness on the disputed issue in the case, since she became intoxicated and was dressed and put to bed by others even before K.S. was.

Whether the statement impugned counsel is questionable, but arguable.  When a witness is asked to confirm having made a prior inconsistent statement, it is not unusual for the witness to try to offer an unresponsive explanation.  The questioner is permitted to cut that off.  It is possible, but not clear, that jurors would view the prosecutor's statement, "Mr. Cossey can clean that up" differently than the more typical, "Counsel will have an opportunity to ask you about that."  Here again, however, any error was harmless.  The statement was fleeting and it was far from a clear implication that for defense counsel to "clean up" Beaver's testimony would be deceptive and dishonest.  And again, the trial court sustained the objection, signaling that the question was improper.

39

*Questioning about "assault"*

Ennis next argues that the prosecutor impermissibly expressed an opinion on guilt by questioning K.S. nine times about being "assaulted": *e.g.*, "'Why didn't you tell him who *assaulted* you?'" and "'Had you told him at that point who *assaulted you*?'" Appellant's Opening Br. at 89 (quoting RP at 862, 866). No objection was made until the ninth question, when the following exchange occurred:

> Q. Okay. You'd been up—you'd suffered a sexual assault, been up until midnight—
>
> MR. COSSEY: Judge, I'm going to object on that. She's doing it constantly. It's not appropriate. She's constantly making that statement. It's not appropriate.
>
> MS. FITZGERALD: Your Honor, I'm stating the fact that there was an assault where fingers were placed inside this woman's vagina. That's why we're here.
>
> MR. COSSEY: It's an allegation, and she's making it as a fact that she's—when she's asking questions.
>
> THE COURT: Okay. Why don't you rephrase.
>
> MS. FITZGERALD: Okay.

RP at 933-34.

The nine questions that are challenged followed K.S.'s testimony, in describing her call to Rassier, that "I was telling him I was scared and what happened. Um, I didn't tell him who, but I told him that *I was just assaulted*." RP at 862 (emphasis added). The first two questions by the prosecutor that are challenged sought more detail about what K.S. told Rassier about being assaulted. In asking for more details, there was nothing

40

improper about the prosecutor asking those questions using the verbiage K.S. testified she used. The prosecutor was not required to ask, *e.g.*, "Why didn't you tell him who *did that thing you told him had just happened*?"

As for the next seven questions, six unobjected to, Ennis cites no authority that asking questions using a victim's shorthand for what happened automatically amounts to expressing the prosecutor's personal opinion. In the case on which he relies, *State v. Reed*, the court found that the prosecutor asserted his personal opinion about the credibility of witnesses and Reed's guilt where

> he called [Reed] a liar no less than four times. Next, the prosecutor stated that the defense counsel did not have a case, and that the petitioner was clearly a "murder two". Finally, he implied that the defense witnesses should not be believed because they were from out of town and drove fancy cars.

102 Wn.2d 140, 145-46, 684 P.2d 699 (1984). The prosecutor's questioning in this case comes nowhere near the misconduct present in *Reed.*

The prosecutor's use of K.S.'s shorthand in asking questions is not reasonably understood as a clear and unmistakable expression of a personal opinion. Particularly where the defense did not move in limine for a blanket prohibition on use of the term, and there was no defense objection, we find no misconduct.

In his reply brief, Ennis argues that "the most egregious" part of the prosecutor's misconduct was her response to the defense objection, when she said, "I'm stating the

41

fact that there was an assault where fingers were placed inside this woman's vagina. That's why we're here." Appellant's Reply Br. at 18; RP at 934.

The statement was atypical of this prosecutor's conduct in the trial, and we wonder if she misspoke. We agree with Ennis that this response to the objection was objectionable, but the fact remains that defense counsel did not object. Nor did he ask the court to strike the prosecutor's response or request a curative instruction. He did take what was arguably a more effective step—he pointed out, "It's an allegation." RP at 934. The objection defense counsel *had* made was implicitly sustained, and the prosecutor did not thereafter refer to an "assault" in her questioning. Ennis does not demonstrate that the prosecutor's response to the objection was so flagrant and ill intentioned that an instruction could not have cured any resulting prejudice.

*Violating motion in limine*

Ennis next argues that the State violated an in limine order. The State, not the defense, moved to "[p]rohibit Doug Strosahl from expressing an opinion as to the credibility of [K.S.'s] disclosure on October 25, 2015." CP at 51 (boldface omitted). The State was concerned about Doug saying he did not report K.S.'s allegations because he believed her version of events "did not 'make sense.'" *Id.* It based its motion on "ER 608, which prohibits a witness from commenting on the credibility of another witness." *Id.* The defense did not object and the motion was granted.

During trial, the State made several references to the fact that Doug did not report K.S.'s allegations. Those references did not violate the terms of the in limine order nor did they implicate the ER 608 basis for the order. There was no misconduct. If Ennis believed the State opened the door to an explanation of why Doug did not report, his remedy was to ask the court to revisit the in limine order.

*Using impeachment evidence as substantive evidence*

Ennis next complains that the State relied on impeachment evidence as substantive evidence when it argued in closing that "at two o'clock" Heather Strosahl "was so worried about how intoxicated [K.S.] was she wanted to go check on her. She talked about doing the rounds, checking to make sure everybody was alive." RP at 1494.

Heather testified when questioned by the prosecutor that by the time Doug got out of bed and joined her and Ennis in the kitchen, she was no longer concerned about K.S. The prosecutor then had Heather read to the jury part of the statement Heather provided to detectives in 2015, in which she said that she, Ennis and Doug decided to "go check on [K.S.], make sure she's doing okay," and that Heather had "wanted to do, you know, a sweep of—make sure everybody's still alive." RP at 599. The defense did not object or ask for a limiting instruction.

A witness may be impeached with a prior out-of-court statement of a material fact that is inconsistent with her testimony in court, even if such a statement would otherwise be inadmissible as hearsay. *State v. Clinkenbeard*, 130 Wn. App. 552, 569, 123 P.3d 872

43

(2005). Impeachment evidence reflects on the witness's credibility but is not probative of the substantive facts encompassed by the evidence. *Id.* (citing *State v. Johnson*, 40 Wn. App. 371, 377, 699 P.2d 221 (1985)). When prior inconsistent statements are admitted as impeachment evidence, an instruction cautioning the jury to limit its consideration of the statement to its intended purpose is necessary and proper. *Johnson*, 40 Wn. App. at 377. But the limitation on use of the evidence is waived if no objection to the introduction of a prior inconsistent statement is made and no limiting instruction is sought. *See State v. Myers*, 133 Wn.2d 26, 36, 941 P.2d 1102 (1997). Here, there was no objection or request for a limiting instruction, so the State was free to rely on the evidence as substantive evidence.

Ennis's reliance on *Clinkenbeard* to argue otherwise is misplaced. *Clinkenbeard*, a prosecution for first degree sexual misconduct with a minor, recognized that absent an objection or request for a limiting instruction, a defendant ordinarily waives objection to the State's use of impeachment evidence as substantive evidence. 130 Wn. App. at 571. The court "decline[d] to deem [the] issue waived" on the particular facts of Clinkenbeard's case, however. *Id.* This was in part because the minor victim's prior inconsistent statements were the only evidence that she and the victim had engaged in sexual intercourse. *Id.* at 570. Additionally, there were serious problems with the record. The court could not be sure that there had *not* been an objection or limiting ruling. *Id.* at 571.

Here, there is no reason not to find a waiver of the limitation on use of the evidence.

III.    INEFFECTIVE ASSISTANCE OF COUNSEL

Ennis argues he was denied effective assistance of counsel because Cossey made multiple errors, including by representing him despite an actual conflict of interest.

When adjudging ineffective assistance of counsel, we look at the entirety of counsel's performance. *E.g.*, *State v. Ciskie*, 110 Wn.2d 263, 284, 751 P.2d 1165 (1988). Alleged deficiencies by counsel are viewed cumulatively when assessing prejudicial impact. *E.g.*, *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998); *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995).

To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate (1) that defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness; and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If a defendant fails to establish one prong, we need not consider the other. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

In order for the court to find deficient performance, the defendant must establish "'that counsel made errors so serious that counsel was not functioning as the 'counsel'

45

guaranteed the defendant by the Sixth Amendment.'" *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011) (quoting *State v. Thomas*, 109 Wn.2d 222, 225, 743 P.2d 816 (1987)). "The threshold for the deficient performance prong is high" and there is "'a strong presumption that counsel's performance was reasonable.'" *Id.* at 33 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." *Kyllo*, 166 Wn.2d at 863.

A defendant must affirmatively prove the required prejudice. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id*. (citation omitted).

Ineffective assistance of counsel claims are reviewed de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

*Conflict-free representation*

Ennis first renews the argument made as a part of his motion for a new trial that an agreement by Cossey not to use the information provided to him by Bugbee violated his duty of loyalty and created an actual conflict of interest.

The State's opposition to the conflict of interest argument relied on its interview of Cossey. It attached a transcript of Cossey's interview to its opposition. The State's opposition and the Cossey interview both remain sealed. In announcing her denial of the new trial motion in open court, the trial court made public the matters material to her conclusion that Ennis had not demonstrated that Cossey had a conflict of interest. We confine our discussion of sealed materials to matters the trial court made public, finding them sufficient to explain our decision as well. We quote at length from the trial court's ruling:

> So the crux of the conflict and the facts that gave rise to the conflict that's been alleged start with some declarations that Mr. and Mrs. Ennis presented to the court, and they discuss a meeting that they had in Mr. Cossey's office back in November of 2015. And at that time both Mr. and Mrs. Ennis in their declarations contend that Mr. Cossey told them that he had had a conversation with homeowner Doug Strosahl's counsel, Mr. Bugbee, and that Mr. Cossey had advised them that he had learned from Mr. Bugbee that Mr. Strosahl had had consensual sexual contact with [K.S.] during the party; that the contact was prior to any contact with Mr. Ennis; that the contact was similar in nature to that had between [K.S.] and Mr. Ennis; and that when Mr. Strosahl and [K.S.] had contact, that [K.S.] believed that Mr. Strosahl was actually Mr. Ennis.
>
> That was all contained in those declarations. And Mr. Ennis's declaration indicates that he was told by Mr. Cossey not to tell anyone. Mr. Ennis's declaration also indicates that he believed that this particular information would be used in his defense and would help him defend his case.
>
> Mrs. Ennis's declaration is similar, but it adds that Mr. Strosahl had told Mr. Bugbee that [K.S.] had called Mr. Strosahl "Gordon"; that she also believed that that information would be used in defending her husband and she also believed that it was going to be used in the state's direct

47

examination of Mr. Strosahl.  We know, of course, that the state never called Mr. Strosahl.

So part of the conflict is, of course, the fact that it's alleged that Mr. Cossey told Mr. Bugbee—or Mr. Bugbee asked Mr. Cossey not to tell anybody about it; Mr. Cossey said, "Okay, but I'm going to tell my client about it."  So that's really in a nutshell what the conflict is: that there's some divided loyalties; that Mr. Cossey failed to use that information to mount a full defense; and that there were some restrictions placed upon Mr. Cossey by virtue of his promise to Mr. Bugbee not to use it.

So again, we know that Mr. Strosahl was never called as a state's witness; he was called by the defense, however.  And I went back through Mr. Strosahl's testimony.  And he answered all of Mr. Cossey's questions, talked about where he was that evening, talked about [K.S.]'s level of intoxication and the fact that he himself, Mr. Strosahl, was very intoxicated.  And as I recall, he had indicated that midway through the party he went to bed because he'd had so much to drink he didn't feel well, he eventually got up out of bed, he went into the kitchen, made some observations and went right back to bed.

Now, Mr. Cossey was interviewed by the parties.  And, of course, this is key.  He recalls the conversation that he had with Mr. Bugbee.  And his recollection of that conversation was that it was—it was given to him or spun to him in the hypothetical along the lines of Mr. Strosahl may have engaged in the same type of contact with the victim.  But Mr. Cossey's— Mr. Cossey indicated that at no time was he ever told that this contact between the two was consensual; and in fact Mr. Cossey believed that the opposite was true, that it was not consensual.  And he firmly believed that that's what Mr. Bugbee told him.  So that changes things a bit, and I'll get to that in just a minute.

Mr. Cossey confirmed that he was asked by Mr. Bugbee to keep it confidential.  Mr. Cossey told Mr. Bugbee, "I'm going to tell my client, of course."  And again, key to this also is the fact that Mr. Cossey was told that Mr. Strosahl would not testify to this; "If you question him, he's not going to admit that this behavior ever happened."

Mr. Cossey denies that Mrs. Ennis was present at that November meeting.  But importantly, Mr. Cossey also indicates that Mr. Ennis was very, very involved in his defense and that Mr. Ennis stated unequivocally that he didn't want to implicate Mr. Strosahl in any of this; that his defense

was consent; that this was a consensual act between himself and [K.S.] and that that's the way the defense was going to turn.

Mr. Cossey opines that because the defense was consent, that this type of testimony would not be of assistance to Mr. Ennis. There would be some very significant evidentiary issues with regard to Mr. Strosahl admitting to a nonconsensual act of this nature, that being Fifth Amendment considerations, hearsay considerations, that sort of a thing. But again, Mr. Bugbee at least as far as Mr. Cossey was concerned made clear that Mr. Strosahl was not going to testify, he wasn't going to allow Mr. Strosahl to testify. And as I recall, Mr. Strosahl's second attorney reiterated the same thing.

RP at 1774-77.

At this point in her oral ruling, the trial court commented on hearings that took place in 2017, when the case was assigned to a different judge. As she observes, and as the record bears out, in the hearings taking place on May 25 and June 7, 2017, there was veiled discussion of Bugbee sharing information with Cossey. What was not veiled at all, however, and was stated with Ennis present, was that Cossey would not be using the information obtained from Bugbee "in any shape or form" at trial. RP (June 7, 2017) at 80.

The trial court then continued with her oral ruling:

We know that Mr. Strosahl was eventually interviewed sometime, I believe, in May of 2017. [K.S.] was interviewed, and according to Mr. Cossey, was very clear and very definite that Mr. Ennis was the perpetrator of this crime.

I will note too that typically when I see motions like this I oftentimes will have something from the witness that will say, "I was ready, willing, and able to come in and testify, yet nobody asked me to do that, nobody asked me these certain questions." I don't have anything from Mr. Strosahl

49

indicating that he would have testified. What I've got is a hearsay or double hearsay kind of a situation, again, with some very particular evidentiary problems if that was going to be attempted to be admitted.

So in order to find a conflict of interest here, I've got to find that Mr. Cossey failed to pursue the other suspect defense based upon the fact that he had loyalties or promises to somebody else. And that conflict has to cause a lapse in representation, it has to be contrary to Mr. Ennis's interests, and it has to affect Mr. Cossey's advocacy.

I considered all of the case law that was presented. I can't ignore the fact that Mr. Ennis is involved in law enforcement; he's specially trained; he's involved in the criminal justice system; he was involved in this case from day one. I don't doubt that he had an equal role in or a very significant role in determining strategy in how this case was going to proceed. And I have no doubt in finding that Mr. Ennis knew that Mr. Strosahl's testimony would not be admitted or even admissible. So based upon all of that, I'm going to find that there was no conflict of interest here that affected Mr. Cossey's representation of Mr. Ennis.

RP at 1778-79.

When an ineffective assistance claim is raised on appeal, the reviewing court may consider only facts within the record. *Grier*, 171 Wn.2d at 29 (citing *McFarland*, 127 Wn.2d at 335). Before we could begin to consider whether evidence of consensual sexual contact between Doug Strosahl and K.S. on the night of the party would have had a reasonable probability of changing the outcome of trial, we would first have to see the evidence and a demonstration that it was admissible. If demonstrating ineffective assistance depends on evidence outside the trial record, a defendant must file a personal restraint petition supported by the necessary evidence. *Id.* (citing *McFarland*, 127 Wn.2d at 335; *Strickland*, 466 U.S. at 691).

Ennis cannot establish ineffective assistance on the existing record. His remedy is to file a personal restraint petition supported by Doug Strosahl's sworn testimony about the contact and that he would have testified to the contact at trial had he been asked.[10]

*Failure to request change of venue*

Ennis next argues Cossey was ineffective by failing to pursue a change of venue. He argues the court would have granted a motion for a change because the judge presiding at the first trial granted a mistrial on account of pretrial publicity.

Any decision to change venue rests largely within the discretion of the trial court. *State v. Clark*, 143 Wn.2d 731, 756, 24 P.3d 1006 (2001). Pretrial publicity is not a sufficient basis, itself, to require a change of venue. "[A] defendant must show a probability of unfairness or prejudice from pretrial publicity." *State v. Hoffman*, 116 Wn.2d 51, 71, 804 P.2d 577 (1991).[11] Conducting voir dire is a means to determine

---

[10] Assuming such evidence is provided in support of a personal restraint petition, a reference hearing might be required, given Cossey's position that he was led to believe the contact was not consensual and Doug Strosahl would refuse to testify.

[11] When deciding whether to grant a motion to change venue, courts consider: "(1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn." *State v. Munzanreder*, 199 Wn. App. 162, 181, 398 P.3d 1160 (2017).

whether an impartial jury can be impaneled, unless media coverage is so pervasive that

bias can be presumed. *State v. Jackson*, 150 Wn.2d 251, 271, 76 P.3d 217 (2003). "'[I]f

a defendant does not exercise all peremptory challenges it is presumed that he or she was

satisfied with the jury.'" *Clark*, 143 Wn.2d at 759 (quoting *State v. Rice*, 120 Wn.2d

549, 558-59, 844 P.2d 416 (1993)).

As *Strickland* observed, "If it is easier to dispose of an ineffectiveness claim on

the ground of lack of sufficient prejudice, which we expect will often be so, that course

should be followed." 466 U.S. at 697. The State's description of the jury selection

process and the jury selected for Ennis's trial persuades us that it is easy to dispose of this

claim on the ground of Ennis's inability to show actual prejudice.

The State provided the following description of Ennis's jury and how it was

selected (we have deleted the State's supporting citations to the record):

> The parties were given nine peremptory challenges each—six for the
> first twelve jurors and three for the alternates. The defendant waived two
> peremptory challenges—one for the first twelve jurors and one for the
> alternate jurors; the State waived three peremptory challenges—two for the
> first twelve jurors and one for the alternates.
>
> Of the 15 jurors[50] who were ultimately empaneled, only five jurors
> indicated any prior knowledge of the case. Each of these individuals told
> the court that despite previously hearing of the case, they could all be fair
> and impartial; one indicated a belief that the news was not always correct;
> one indicated that she did not form any opinions based upon what she had
> previously read; one indicated that he had heard something through co-
> workers about jury duty for the case, but nothing substantive about the case
> itself, and did not see any news coverage in the paper, television, or
> internet; one indicated that she had heard that jurors were being called for

the case, and knew that it involved a police officer, but nothing substantive about the allegations; and, an alternate juror stated that although she had heard of the incident on both the TV and internet, she understood her duty was to judge the case based upon the evidence only; she recognized the news can be incorrect or biased.

_____

[50]Including the alternate jurors.

Br. of Resp't at 74-75 (record citations omitted).

In reply, Ennis argues only that venire juror 37, who had read extensively about the case, who he challenged for cause, and who nonetheless was seated as the first alternate juror, was biased. He did not exercise an available peremptory to remove her, however, and she ultimately was not needed and was excused.

This information on the jury's selection suggests not only that a motion to change venue would not have been granted, it makes it impossible for Ennis to affirmatively demonstrate that he was actually prejudiced by the seating of a biased jury.

*Dismissal of a valid defense*

Ennis next argues that Cossey provided ineffective assistance when he "discarded [the reasonable belief] defense during closing argument, telling the jury not to consider it." Appellant's Opening Br. at 110. He relies on the following closing argument (the emphasis is Ennis's):

I believe that there are certain jury instructions that are going to be important. And one of them goes—it's No. 11, and Judge Moreno read it. And it's the one that says, "If the defendant reasonably believed that [K.S.] was not mentally incapacitated or physically helpless," *if he had that*

53

> *reasonable belief, given everything we've shown you, everything you've seen, the video, the pictures, everything you've heard, that if more likely than not that you believe he reasonably believed she was capable of consent, then that is another prong that you have to consider in your deliberations. But I don't believe you need to do that, because here's why.* They're telling you his story doesn't make sense. There was two people there. Only those two people know what happened. Go through the timeline. Go through the testimony. You will make the decision that [K.S.'s] version of what happened that night does not make sense. We know what her reasons are. She told you those. She told you her motivation.

*Id.* at 111 (alterations in original) (citing RP at 1535). Before explaining the defendant's burden of proof, the exact text of the court's instruction 11 was, "It is a defense to a charge of rape in the second degree that at the time of the act the defendant reasonably believed that [K.S.] was not mentally incapacitated or physically helpless." CP at 325.

We reject the premise that the defense was "discarded" and Cossey told the jury "not to consider it." Cossey directed the jurors' attention to the instruction, telling them it was one of "certain jury instructions that are going to be important." Appellant's Opening Br. at 110; RP at 1535. He argued, "I don't believe you have to [consider]" the affirmative defense, but this was based on his argument that once they considered the evidence, the jurors would conclude that by 2:40 a.m., K.S. "had her full faculties, knew what was going on, and was a willing participant." RP at 1535-36.

The only legal authority cited by Ennis in support of this challenge is case law holding it can be deficient representation not to request a reasonable belief instruction

when the facts support it. Cossey requested the instruction. He reminded the jury of it during closing. He elected to argue that the jury would not need to reach the affirmative defense because they would be satisfied the State had not proved its case.

"There are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. Because of the difficulties of eliminating the distorting effects of hindsight, we indulge a strong presumption that counsel was effective and "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). Ennis has not overcome the presumption here.

*Failure to present exculpatory evidence*

Ennis next takes issue with Cossey's failure to elicit certain exculpatory evidence from Weese and Beaver. The State objected to the evidence, so in order to prove that failure to elicit the evidence was ineffective assistance, Ennis must show, among other things, that the evidence was likely to be admitted over the State's objection. *Cf. In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004) (where failure to object is characterized as ineffective assistance, defendant must show that objection would have been sustained).

Immediately before the State called Weese as a witness, counsel spoke with the trial court outside the presence of the jury about a motion in limine involving Weese on

55

which the court had reserved ruling. They explained that when Weese was interviewed, she said she had been under the impression that Ennis and K.S. were "a couple," but when pressed about why she thought that, "she really [could not] answer that." RP at 740. Cossey told the court that he and the prosecutor had agreed that Weese could talk about her observations but "she cannot use her intuition or her gut instincts as part of her testimony." *Id.*

Immediately before the State called Beaver, the lawyers told the trial court that Beaver presented an issue similar to the issue presented by Weese. Specifically, when interviewed by detectives, Beaver volunteered that she thought K.S. "had some kind of puppy love going" for Ennis, but when asked for her reasons, she was not able to provide any. RP at 799. "She just state[d] that that was her feeling and that's what she thought was going on." *Id*. Here again, Cossey agreed with the prosecutor that Beaver's observations were admissible but her "feeling" that K.S. had "puppy love going" for Ennis was not.

Ennis argues that Cossey's acquiescence to the State's objection to the testimony was unreasonable. He argues that the testimony would probably have changed the outcome of the trial. Since no offer of proof was made, the only exculpatory evidence supported by the record is Weese's unexplained inference that K.S. and Ennis were a couple and Beaver's unexplained inference that K.S. had "puppy love going" for Ennis.

56

For a lay witness's testimony in the form of an opinion or inference to be admissible, it must (among other things) be "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." ER 701(b). An opinion or inference may be unhelpful and objectionable on the grounds that the subject matter is sufficiently understandable to a lay jury to allow the jurors to hear the facts and reach their own conclusions without the interjection of the witness's opinion. 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 701.5 at 12 (6th ed. 2016) (citing *Johnson v. Caughren*, 55 Wash. 125, 104 P. 170 (1909)).

We found no postrule Washington case law on this ER 701(b) requirement, but federal authority on Federal Rules of Evidence (FRE) 701(b), which ER 701(b) parallels, provides guidance. *See Beal v. City of Seattle*, 134 Wn.2d 769, 777, 954 P.2d 237 (1998) ("Where a state rule parallels a federal rule, analysis of the federal rule may be looked to for guidance.").

A leading federal treatise describes FRE 701(b) as placing a limitation on lay opinion where the costs of the opinion outweigh its benefits. 29 CHARLES ALAN WRIGHT & VICTOR GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6255 (2d ed. 2016). Three ways in which the cost of a lay opinion can outweigh its benefits are where it deprives the jury of details the jury needs to determine the facts, where it adds nothing, and where the witness lacks a sufficient basis for the opinion. *Id.* at 171-73. "[T]he costs

of lay opinion increase and the benefits diminish the closer the opinion approaches the crucial issue[ ] in the case." *Id.* at 174.

The decision of the federal Second Circuit Court of Appeals in *Hester v. BIC Corp.*, 225 F.3d 178, 185 (2d Cir. 2000), is illustrative. In that case, the court held that "in an employment discrimination action, Rule 701(b) bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision."

> Witnesses are free to testify fully as to their own observations of the defendant's interactions with the plaintiff or with other employees, but the witness's opinion as to the defendant's ultimate motivations will often not be helpful within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference as to whether or not the defendant was motivated by an impermissible animus. The four witnesses here testified that they observed Beck treat Hester with (variously) condescension, coldness, hostility or disregard, as compared with the three or so other Group Leaders, who were white. A jury can draw its own conclusions from observed events or communications that can be adequately described to it, such as the observed differential treatment described by Hester's witnesses. But their speculative lay opinion that this differential is attributable to race rather than anything else, is not helpful in this case because it merely tells the jury what result to reach.

*Id.* (brackets, citations, and quotation marks omitted) (quoting *United States v.Rea*, 958 F.2d 1206, 1215-16 (2d Cir. 1992).

Ennis cannot demonstrate that Weese's and Beaver's unexplained inferences were likely to be admitted over the State's objection. "The trial court is vested with wide discretion under ER 701." *State v. Kinard*, 39 Wn. App. 871, 874, 696 P.2d 603 (1985).

Evidence established that the night of the party was the first time Weese and Beaver met

K.S. Presenting the evidence of what these two witnesses observed about K.S.'s

demeanor and actions put the jury in as good a position as the witnesses to assess whether

their observations bore on Ennis's claim that the sex was consensual. The issue of

whether K.S. was enamored of Ennis or only liked and respected him was a material one,

so the cost of admitting unhelpful opinions was high.

Also, with respect to Weese's testimony, Ennis cannot demonstrate that it

probably would have changed the outcome of trial. The testimony of both K.S. and Ennis

established that they were not a couple. Excluding Weese's mistaken inference that they

were could not have had any impact whatsoever on the outcome of the trial.

*Failure to object to the State's misconduct*

Without any authority, discussion of the facts, or analysis, Ennis asserts that

Cossey's failure to object to the alleged instances of prosecutorial misconduct was

deficient and prejudicial. We decline to address the assertion. Passing treatment of an

issue or lack of reasoned argument is insufficient to merit judicial consideration.

*Brownfield v. City of Yakima*, 178 Wn. App. 850, 876, 316 P.3d 520 (2014); RAP

10.3(a)(6).

IV.    CUMULATIVE ERROR

Ennis finally asks that in the event we find no single alleged error to be reversible

error, we find that the cumulative effect of trial court errors warrants reversal. Under the

59

cumulative error doctrine, a defendant may be entitled to a new trial when the trial court's multiple errors combine to deny the defendant a fair trial. *State v. Lazcano*, 188 Wn. App. 338, 370, 354 P.3d 233 (2015) (citing *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835 (1994)). The defendant bears the burden of proving an accumulation of error of sufficient magnitude to warrant a new trial. *Id.* (citing *Lord*, 123 Wn.2d at 332).

The only error we have found—arguably two errors—is the prosecutor's objected-to statement in cross-examining Beaver that argumentatively impugned Beaver's credibility and arguably impugned defense counsel. Viewed as two errors, cumulatively, they come nowhere near casting doubt on the fairness of Ennis's trial.

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG), Ennis makes what he characterizes as further arguments in support of (1) Cossey's alleged conflict of interest, (2) the giving of the corroboration instruction, and (3) the prosecutor's alleged misconduct in commenting on Ennis's silence. These issues were adequately addressed by counsel. They will not be considered further. *See* RAP 10.10(a) (a SAG is available for matters that have not been adequately addressed by counsel's briefing).

Ennis makes an additional argument of ineffective assistance of counsel. He complains of Cossey's failure to object to the State's motion in limine preventing Doug Strosahl from expressing an opinion as to the credibility of K.S.'s disclosure of the

alleged assault. Ennis argues that Strosahl's opinion would not have been a mere lay opinion; it would have been the opinion of a law enforcement expert who has taught college level classes on interviewing and report writing. SAG at 10.

An objection to one witness's opinion of another witness's credibility is actually *most* likely to be sustained when the opinion is expressed by a police officer. "Testimony from a law enforcement officer regarding the veracity of another witness may be especially prejudicial because an officer's testimony often carries a special aura of reliability." *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007). Cossey's decision not to object to the in limine motion was not deficient performance.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____          _____
Pennell, C.J.                                    Lawrence-Berrey, J.